**159 So. 378**

**COX v. COX.**

**Nos. 32912, 32920.**

Feb. 4, 1935.

Hugh M. Wilkinson and A. Miles Coe, both of New Orleans, for appellant.

John E. Jackson and Baldwin J. Allen, both of New Orleans, for appellee.

LAND, Justice.

This is a suit for divorce on grounds of adultery.

Plaintiff married defendant in the parish of St. Bernard, March 15, 1930. The matrimonial domicile has always been in the city of New Orleans.

About March, 1933, defendant engaged in a venture of operating excursion steamers out of Chicago on the Great Lakes, and in this connection took up his residence chiefly in Chicago through the spring and summer of 1933, and practically until this suit for divorce was filed on October 6, 1933.

Plaintiff specifically accuses defendant of adultery in Chicago with two women, one named Naomi Spalding, in his bedroom at the Medinah Club, where he resided in Chicago, on or about June 28, 1933; and with another named Mildred Mason, with whom, it is alleged, he first had relations in the Eastgate Hotel on or about June 4, 1933, and with whom, it is further alleged, defendant practically lived for about two weeks thereafter, either ashore or aboard his steamship, the Isle Royale, which was making week-end excursion runs on the lakes.

After this divorce suit was filed against him, October 6, 1933, defendant moved his residence to the Roosevelt Hotel, New Orleans, La., and it is charged that defendant in his room at this hotel also committed adultery on November 1, 1933, with a third woman, named Patricia Morris.

In our opinion, the charge of adultery with Mildred Mason in Chicago is abundantly proved by ten witnesses, whose testimony was taken under commission. The other charges of adultery will be reviewed in this opinion later.

Reducing the depositions of these witnesses to narrative form, we have the following state of facts:

Rube Shafford, an automobile salesman of Chicago, who lived in the same club with the defendant, Mr. Cox, introduced him early in June, 1933, to Mildred Mason, as both Shafford and Miss Mason testify, and Mr. Cox admits.

The following Sunday, Mr. Cox took Miss Mason to the Chicago Exposition, accompanied by two other couples, Shafford and Mildred Bach, and George Wentz and Joanne Meyer. Wentz was the general manager of Cox's Steamship Company in Chicago, and Miss Meyer was Mr. Cox' publicity agent. This trip to the Fair is testified to by all five of Cox' companions.

About 8 or 9 o'clock that night, they left the Fair. Wentz and Miss Meyer separated from the party, but Mr. Cox and the other three repaired to Shafford's room in the Eastgate Hotel, where later on Shafford and Miss Bach left Mr. Cox alone with Miss Mason, as Shafford, Miss Bach, and Miss Mason all testify.

On this occasion, Mr. Cox swapped hotel keys with Shafford, who spent the night in Mr. Cox' room at the Medinah Club, as Shafford testifies. Mr. Cox then spent the night with the Mason woman in Shafford's room in Eastgate Hotel, as she testifies.

Several evenings later, Mr. Cox took Miss Mason to dinner at the Rutledge Inn at the World's Fair, and afterwards kept her that night in his room at the Medinah Club, as Miss Mason testifies. It was on this occasion

that Mrs. Cox, plaintiff, heard a woman's voice in Mr. Cox' room over the long-distance telephone.

The Isle Royale, Cox' excursion steamer, was put in commission Friday, June 9, 1933, and on the night Miss Mason spent with him in his room in the Medinah Club, she testifies that he arranged to have her as his companion aboard the boat.

In corroboration of this testimony, it appears that on Friday, June 9, 1933, Mr. Cox had Miss Mason meet him at his office and together with his nephew, Bob Rose, the three went to Mr. Cox' room at the Medinah Club, where she packed his clothes and personal effects for the trip. Ben Berkson, purchasing agent of Cox' Steamship Company, and Mr. Ehwan, vice president of the Beloit Dairy Company, visited the room and saw Miss Mason there, this incident in Mr. Cox' room being testified to by Miss Mason and Mr. Berkson both.

Although Miss Mason was going to sail aboard the Isle Royale ostensibly as a "waitress," she rode from the Medinah Club to the boat with the president of the steamship company in Mr. Ehwan's Chevrolet coupé, driven by Mr. Ehwan, while Berkson and Rose walked, as Miss Mason and Berkson further testify.

On the publicity rides on Lake Michigan that night, Miss Mason appeared on board at functions as the companion of Mr. Cox, as is sworn to by Miss Bach, George Wentz, Miss Meyer, Ben Berkson, Captain Clark, master of the vessel, and Miss Mason.

On the ensuing week-end, June 10–11, 1933, on a round trip to Milwaukee, and through the ensuing week in port at Chicago, Mr. Cox kept Miss Mason living aboard the vessel in his cabin, "Parlor M," as is sworn to not only by her, but also by Shafford; by Wentz, the line's general manager; by Miss Meyer, the boat's publicity agent; by Berkson, the purchasing agent; by Griffith, the general agent for ticket sales; by Captain Clark; by First Officer Tyron; and by Second Officer Monroe.

At the end of the week during which Miss Mason lived with Mr. Cox on the Isle Royale, the vessel was scheduled to leave on a weekend excursion, June 17–18, 1933, for Fort William, Canada, and on the night of departure, Mrs. Cox arrived in Chicago and was escorted out into Lake Michigan by Mr. Shafford; Mrs. Cox having planned to make the initial voyage.

Before Mrs. Cox boarded the Isle Royale, the Mason girl, although aboard as "a waitress," was moved out of Mr. Cox' cabin, but not to the "flicker," or waitresses' quarters, but to cabin 201. Mrs. Cox learned of her presence in a guest cabin, and, being an executive of the steamship line herself, arranged for her removal to the crew quarters. The Mason woman objected, but Captain Clark ordered the chief stewardess, her superior in personnel, to remove her, which was done, and she displayed unwillingness to perform the duties of "a waitress." This is testified to not only by the Mason woman, but by General Manager Wentz, by the first and second officers of the ship, and most fully by Captain Clark.

On the voyage, Mr. Cox associated and danced with the Mason woman in front of Mrs. Cox, as the Mason woman testified.

Other than the ten witnesses who gave their testimony for plaintiff under commission in Chicago, the only persons who testified were Mrs. Cox, Mr. Cox, and a man named Warren C. Zoeller.

Mr. Cox, of course, denied the adulteries charged.

His only witness is one Zoeller, who operated the liquor bar on Canadian trips and slot machines on the Isle Royale, and who, eliminating the ship's more reputable personnel, was alone picked out by Mr. Cox to come to New Orleans and testify in the case regarding events on shipboard. This witness knows nothing except the attempted corroboration by his testimony of all of Mr. Cox' denials of the actual adultery. His whole effort has been to put Mildred Mason aboard the vessel solely in the role of "a waitress." He says that Miss Mason did not sleep in Mr. Cox' cabin the night of the first excursion, the publicity rides with newspaper men and debutantes on Lake Michigan, *because he and Mr. Cox slept there together that night.*

He says "She *worked* one night when we had the newspaper men out for a ride to give us a little publicity, and I hired some extra girls for $2.50 a piece to serve this dinner *and she worked that time.*"

Berkson, purchasing agent, one of plaintiff's witnesses, swears positively that Mildred Mason was aboard the Isle Royale *as Mr. Cox' companion* on the night of June 9th, when the publicity ride on Lake Michigan took place.

Zoeller is further contradicted, in his statement that Miss Mason worked as "a waitress" that night, by the general manager of the company, George Wentz, and the publicity agent, Miss Meyer, who both swore that, together with Mr. Cox and Mildred Mason, they made up a party of four which publicly appeared at the dinner for the newspaper men.

Zoeller's whole effort to put Mildred Mason aboard the vessel in the role of "a waitress" becomes ridiculous and patently false, in the face of the testimony given by every one else, from the captain of the ship down.

This witness places himself as a guardian angel in and around Mr. Cox' cabin and never saw Miss Mason there. He connects himself, however, in his capacity as steward, with her removal from a stateroom, and makes it out to be a "coy habit of the waitresses" to sneak up into first-class cabins to sleep, aboard a 360-foot passenger steamship operating under maritime regulations and discipline.

He attempts to make Miss Mason the companion of Shafford on the Milwaukee trip, claiming that Shafford took his car along and drove back from Milwaukee. This was the one trip the vessel came directly back to Chicago. So, why should Shafford, *who testifies he was not on the trip*, have taken such a long drive back, even if he had gone?

Let us consider Zoeller's probable interest in the case. He says that he was working as a cook in the Columbus Hotel at Miami, Fla.; that Mr. Cox sent him a telegram and asked him to call him up; that he called up, and Mr. Cox said that he would like to have him to come over; that it was "nice" here; that he was "very friendly" with Mr. Cox and was in Chicago; that Mr. Cox wanted him to come over because "the divorce case was going on"; that Mr. Cox wanted him "to stay out at his

house *and console him*," and he supposed Mr. Cox wanted to use him as a witness; *that he paid his own expenses to come to New Orleans, and Mr. Cox had not promised to refund those expenses*, but that he has $450 salary coming from the Isle Royale Transportation Company, and while Mr. Cox did not promise to pay it, Zoeller expects to get it some day, but did not ask Mr. Cox for it. Zoeller is the only witness Mr. Cox produced or applied to take the deposition of, out of 100 or more members of the ship's personnel, some of whom he certainly could have called to his assistance, if he were being made the victim of a conspiracy by plaintiff's witnesses, as contended by Mr. Cox.

Let us consider Zoeller's testimony in connection with some of the devious methods used by Mr. Cox in attempting to procure the testimony of other witnesses in his behalf.

Testimony of Walter Von Gronau:

"Q. Was there ever any suggestion on the part of anybody else that testimony not in accordance with the exact state of facts should be given? A. Mr. Waterman and myself had discussed the case on numerous occasions with Mr. Cox, the mode of defense and so forth, and he had always suggested to us to give the account of the circumstances at the Roosevelt Hotel (referring to Cox' adultery with Patricia Morris) *in an untruthful manner*." T., vol. 2, p. 274.

Testimony of Rolland D. Waterman:

"Q. Now what, if anything, did Mr. Cox say about the testimony to be given regarding that woman incident? (Roosevelt Hotel adultery). A. Well, Mr. Cox said on all of those occasions that he didn't see why he had any-thing to worry about in this incident, inasmuch as there were three of us there, and we could blast any testimony Mr. Wilkerson would put forth *by saying that the door was unlocked and that Mr. Von Gronau was in the room at all times.*

"Q. Now, was that in accordance with the facts of the case? A. Whenever this was brought around, we told him *that was not the case*, and that we didn't intend to get up there and tell anything like that. And whenever we mentioned the fact that if we were called on the witness stand in this thing, we would tell the truth, he dropped the matter then and there or else went into a rage." T., vol. 2, p. 303.

Defendant called Dr. Farley, a reputable practitioner, to his residence the night of October 10, 1933. Here is how Dr. Farley described Mr. Cox' behavior on that occasion (page 236):

"Mr. Cox' sister stepped out of the door and said "For God's sake be careful of George', and the usual greetings occurred, and a few minutes later Mr. Cox asked me to come in a room as he wanted to talk to me privately, and I went in with him and he locked the door and he said 'Here is the key' and he put it in his pocket, and said 'One of us is going out dead,' and he had the key in his pocket, and on numerous occasions he said I would die in that room and when my folks saw me again I would be dead.

"Q. Did he tell you why you would be dead and if you wanted to live what you should do? A. Yes, he wanted me to give testimony in a divorce suit, *which I could not give.*

"Q. In this case? A. Yes.

"Q. Would you mind stating what the testimony was he wanted you to give? A. I think that is a professional privilege I have.

"By the Court: No, it is not. You were there to be killed.

"A. One was *that he was impotent* and the other was that I had produced an abortion on his wife."

The tampering with these witnesses by defendant necessarily arouses the grave suspicion of this court as to the veracity, not only of defendant's lone witness, Zoeller, but as to the veracity of defendant himself. Particularly is this so in this case as both Zoeller and defendant are flatly contradicted by plaintiff's witnesses.

Reverse the case. Suppose Zoeller was the only witness Mrs. Cox had placed on the stand to corroborate the testimony of the Mason woman as to the acts of adultery charged, and defendant had produced the ten witnesses of the plaintiff to contradict his testimony. Would any court of justice hesitate under such circumstances to reject plaintiff's demands?

The charges against defendant of adultery with the Mason woman are sustained by an overwhelming preponderance of testimony, through the depositions of ten of plaintiff's witnesses (see page 13).

The transparent effort to impeach this whole record through the negatives and evasions of Zoeller should not be allowed to succeed. The witnesses of plaintiff are apparently respectable persons, with the exception of the woman in the case. It is true that some of the witnesses were employees of defendant.

It is equally true that an employer may conduct himself in such a reprehensible manner as to place himself beyond the pale of protection by his own employees, and even by his best and most intimate friends. But few men, in such a case, are willing to deliberately perjure themselves, in a court of justice, at the risk of conviction for a felony and loss of reputation.

Should this court, in the face of the abundant proof in this case, hold that the charges of adultery with the Mason woman have not been proved, then it would be difficult, if not impossible, to establish such a charge in any case.

2. Now as to the charge of adultery alleged to have been committed by defendant with Naomi Spalding in his bedroom at the Medinah Club in Chicago on or about June 28, 1933.

This was after the charge and proof of various acts of adultery committed by defendant with Mildred Mason in Chicago at earlier dates in June of that year.

Shafford testifies that Mr. Cox requested him to send him a couple of girls, which he needed as waitresses on board the steamship Isle Royale on its week-end trips on the Great Lakes out of Chicago, and that Naomi Spalding was one of the girls he directed to Mr. Cox for that purpose. She corroborates this testimony, and states that she telephoned Mr. Cox about June 24, 1933, about the middle of the afternoon, and that he asked her to come to the Medinah Club, about 6 o'clock, saying that it was his residence, but that he also used it as his office.

When she reached the place, Mr. Cox asked her to go out to dinner, and invited her to

return to his room in the Medinah Club. She did so, and states that Mr. Cox told her that he wanted her to be on the boat, that he would pay her $30 or $35 per week, and offered to purchase for her some new clothes so that she would look presentable on the job. Later on in the conversation, Mr. Cox made advances to her, and induced her to submit to his embraces. She left the Medinah Club that night about 3 a. m.

Shafford testifies that Mr. Cox had told him that he had had intercourse with both of the girls, Naomi Spalding and Mildred Mason.

Ben Berkson testified as follows:

"Q. Did Mr. Cox ever discuss with you, or admit to you, that he had sexual relations with the girl named Naomi Spalding, and if so, please state as accurately as you can, what Mr. Cox told you? A. Yes. Regarding Naomi Spalding, Mr. Cox told me that his feeling towards her was very strong, that he enjoyed her company immensely.

"Q. Please state any other fact within your knowledge which may, in your opinion, have some bearing upon this case, as if you had been interrogated thereon. A. During some of our conversation, Mr. Cox told me he had stayed with one of the girl friends on the boat by the name of Adeline Healing. She worked on the boat as a nurse, and it is a known fact by all employees on the boat that she had stayed with Mr. Cox at the hotel at Isle Royale and also at the hotel at Fort William."

In the case of Houlton v. McGuirk, 122 La. 359, 47 So. 681, 16 Ann. Cas. 1117, the court said:

"On the merits we think the judgment must be affirmed. The adultery is testified to by two eyewitnesses, and the transcript reeks with incidents showing an adulterous disposition on the part of defendant.

"These incidents, although not connected in time or place with the alleged act of adultery, are nevertheless relevant, in that they go to show a disposition on the part of defendant to commit the offense, and add to the probability of her having done so. 11 A. & E. E. of L. 754; 14 Cyc. 694."

George Wentz also testified: "I also know of the intimate relations Mr. Cox had with three other young ladies, one of these being a young lady whose first name is Naomi."

3. With the adulterous disposition of defendant clearly established by the above testimony, we will now consider the evidence as to the charge of adultery committed by Mr. Cox with Patricia Morris in his bedroom in the Roosevelt Hotel, New Orleans, La., November 1, 1933, twenty-five days after this divorce suit was filed.

We consider it proper to state in this connection that Mr. Cox was divorced by the civil district court for the parish of Orleans on February 21, 1930, from a former wife, Mrs. Carrie Jordan Cox, for the reason that he had committed adultery in his own home with a trained nurse named Garrison on January 13, 1929.

Walter Von Gronau and Rolland D. Waterman testified that Mr. Cox had locked himself and this woman in the bedroom, leaving them in the parlor, and that Waterman went over to Mr. Cox' lawyers' offices in the Canal Bank Building and told them he had a wo-

man in his room, but that the lawyers agreed that they could do nothing about it.

Von Gronau also testified that, later in the afternoon, George Dawson, the hotel manager, asked about the presence of a woman in Mr. Cox' bedroom, and, although the woman was still there, Mr. Cox came to the bedroom door and stated that he had no woman in his room; that later Mr. Cox' bedroom phone rang and he told Von Gronau that a man's voice accused him of having his wife in his room; that Mr. Cox became frightened, and Von Gronau went into the bedroom to get the woman to leave, and found her outer clothes on a chair; that he found the woman herself in her underclothes in the bedroom and helped her dress and get away.

There is no dispute that Patricia Morris was in Mr. Cox' hotel suite at the Roosevelt Hotel in the city of New Orleans about 2 o'clock in the afternoon of November 1st, 1933. Mr. Cox, and one of his lawyers, Raoul Sere, Von Gronau, and Waterman were present when she arrived. Mr. Cox claims that the woman had come to give information about the whereabouts of Mrs. Cox and the child. Although one of his attorneys was present, he did not take her information up with him as would have been natural under the circumstances, but waited until his lawyer had departed, and then conducted his feminine visitor into his bedroom, although he could have conversed with her in the parlor of his two-room hotel suite.

Mr. Cox claims that, at the very beginning of his bedroom conversation with Patricia Morris, he discovered that the information she was to give was not about his wife, because of a difference in the color of her eyes, but about another woman.

Then, the question arises: Why did Mr. Cox detain Miss Morris in his bedroom for two hours or longer, drinking whisky with her, removing his dressing gown, and being otherwise in his nightshirt and barefooted?

His statement that she only took off her hat, and that the intervening door between the bedroom and parlor was closed but not locked, is flatly contradicted by Waterman and Von Gronau, who testified that he locked himself and the woman in the bedroom. These are the witnesses from whom Mr. Cox attempted to procure the false statement: That the door was unlocked and that Von Gronau was in the room at all times.

Waterman attempted in vain to save Mr. Cox from the dilemma in which he finally placed himself, by hurrying to the office of Mr. Cox' lawyers and advising them of the presence of the woman in Mr. Cox' apartment. This was manifestly an act of good faith upon Waterman's part, and was intended for the protection of his employer.

It is true that Waterman and Von Gronau were employees of Mr. Cox. Such employment, however, in our opinion, did not place either of them under any obligation whatever to take the witness stand in this case and give false testimony in behalf of their employer. The fact that they refused to do so, instead of subjecting these young men to criticism or affecting their credibility, commands respect and admiration for their moral courage and integrity.

Under all of the facts and circumstances of this particular case, we feel convinced that

plaintiff has proved all three of the charges of adultery with Mildred Mason, Naomi Spalding, and Patricia Morris, preferred by her against defendant.

This conclusion necessarily carries with it the rejection of the plea of impotency made by defendant. If any other evidence were needed on this point, it is found in the testimony of Mrs. Cox, who has testified to cohabitation with her husband while in Chicago in June, 1933, and also while he was in New Orleans on a brief visit the latter part of July, 1933. Mr. Cox was 51 years old when he married plaintiff in 1930. George M. Cox, Jr., was born August 28, 1931. He was only 53 years old in 1933, when the various acts of adultery are charged by plaintiff. Under these circumstances, we do not find it necessary to remand the case to have Dr. Young testify that he examined Mr. Cox on or about June 20, 1932, and found certain neurological and physical conditions, including a "fractured P——." Manifestly, such conditions, if they ever existed, had passed away in June, 1933, when defendant's liaisons with Mildred and Naomi occurred in Chicago, and his virility must have remained intact as late as November 1, 1933, the date of the Roosevelt Hotel assignation with Patricia in the city of New Orleans.

Plaintiff's suit was dismissed in the court below as of nonsuit. From this judgment plaintiff has appealed.

For the reasons assigned, the judgment appealed from is annulled and reversed.

It is now ordered that there be judgment in favor of plaintiff, Mrs. Thelma Agnes Goertz Cox, wife of George M. Cox, Sr., against defendant, George M. Cox, decreeing a divorce a vinculo matrimonii between them, and dissolving forever the bonds of matrimony heretofore existing between them, and granting to plaintiff the permanent care, custody, and control of her minor child, George M. Cox, Jr., two years of age, and that defendant pay all costs.

It is further ordered that otherwise the case be remanded for further proceedings to enforce payment of the accrued and past-due alimony pendente lite, to partition the community property, and to fix the amount of permanent alimony for the support of plaintiff, Mrs. Thelma Agnes Goertz Cox, and the minor, George M. Cox, Jr.

O'NIELL, C. J., concurs in the decree.